903 P.2d 794 (1995)
Aurelio Pintor ALEJANDRE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 25340
Supreme Court of Nevada.
October 4, 1995
*795 Frederick B. Lee, Jr., Public Defender, Elko County, for appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Gary D. Woodbury, District Attorney and Sherburne M. MacFarlan, III and Robert Lowe, Deputy District Attorneys, Elko County, for respondent.

OPINION
YOUNG, Justice:

FACTS
John Martinez ("Mr. Martinez"), an agent with the Drug Enforcement Agency ("DEA"), observed two vehicles, a Grand Marquis and appellant Aurelio Pintor Alejandre's ("Aurelio") Ranchero truck, heading east on Interstate 80. Mr. Martinez became suspicious because the vehicles were being driven in tandem, had California plates and tinted windows.
Mr. Martinez called the Nevada Highway Patrol ("NHP") and discovered that both vehicles were registered in Oakland, California. The Grand Marquis was registered to a body shop from which a different vehicle had previously been seized for narcotics related activity. Mr. Martinez also ran a "lane check" on the vehicles that reveals whether they had ever crossed the U.S./Mexican border. The Grand Marquis apparently crossed the border six months prior. Aurelio's truck, however, was not registered to the body shop nor did it come up on the "lane check." Mr. Martinez called his office and was told that these facts were not sufficient "articulable facts" to stop either vehicle. Regardless, Mr. Martinez called the NHP to obtain assistance in stopping the vehicles. At that point, Mr. Martinez had followed the vehicles from Fernley to about ten miles outside Winnemucca.
NHP Trooper Thomas E. Ames ("Trooper Ames") received a call from the dispatcher telling him to "develop probable cause to stop the vehicle [Aurelio's truck]." Trooper Ames caught up with Aurelio's truck and followed it for about four miles. Trooper Ames testified that on two occasions he witnessed Aurelio's truck cross over the fog line, the white line on the right-hand side of the road, about "a tire width." However, Trooper Ames admitted that he was basically looking for some reason to pull the truck over. In fact, even after Aurelio's truck crossed the fog line, Trooper Ames waited until an exit to pull Aurelio's truck over to where there was better light, indicating that Trooper Ames was not worried about the recklessness of Aurelio's driving.
Trooper Ames testified that it was apparent Aurelio did not speak English. Nonetheless, Trooper Ames, to search Aurelio's truck, had Aurelio sign a consent form that was written in English. Trooper Ames did not orally translate the consent form for Aurelio. After Aurelio signed the consent form, Trooper Ames put him in handcuffs.
Trooper Ames then searched the truck and found skis, poles, tools and some clothes, but no contraband. Trooper Ames then called in a drug dog. With the drug dog's assistance, Trooper Ames discovered marijuana by removing the taillights of Aurelio's truck.
Before trial, Aurelio, maintaining that the stop of his truck was pretextual and that he did not give consent, filed a motion to suppress the evidence discovered during the search of his truck. The district court denied *796 the motion to suppress. The district court, adhering to the philosophy of the United States Courts of Appeals for the Seventh and Eighth Circuits, determined that the stop of Aurelio's truck did not constitute an unconstitutional pretextual stop. In addition, the district court determined that Aurelio consented to the search.
Aurelio was convicted, pursuant to a jury verdict, of one count of possession of a controlled substance. Aurelio was sentenced to six years in the Nevada State Prison. Aurelio appeals, arguing that the traffic stop and subsequent search were violative of the Fourth Amendment of the United States Constitution. We agree.

DISCUSSION
It is well established that an arrest may not be used as a pretext to search for evidence. United States v. Lafkowitz, 285 U.S. 452, 467, 52 S.Ct. 420, 424 76 L.Ed. 877 (1932). "[A] pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." United States v. Guzman, 864 F.2d 1512, 1515 (10th Cir.1988).
In determining whether the stop violated the Fourth Amendment, an objective test should be utilized. "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." Scott v. United States, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978).
However, two conflicting objective tests have emerged. The first test, labeled the "would" test, asks whether a reasonable officer would have stopped the vehicle in the absence of an invalid purpose. See United States v. Miller, 821 F.2d 546, 549 (11th Cir.1987). The second test, labeled the "could" test, focuses on whether the officer was legally authorized to make the stop. See United States v. Meyers, 990 F.2d 1083, 1085 (8th Cir.1993). In applying the "could" test, "the stop `remains valid even if the officer would have ignored the traffic violation but for his other suspicions.'" Id. (quoting United States v. Cummins, 920 F.2d 498, 500-01 (8th Cir.1990), cert. denied, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991)).
We conclude that this court should follow the United States Court of Appeals for the Ninth Circuit in adopting the "would" test. See United States v. Hernandez, No. 94-30109, slip op. at 3 (9th Cir. May 17, 1995) (affirming that the Ninth Circuit follows the "would" test); United States v. Cannon, 29 F.3d 472, 476 (9th Cir.1994) ("[W]e treat our previous cases as consistent with the Tenth and Eleventh Circuits' objective `would have' standard.").[1]
Although the United States Supreme Court has not directly addressed the issue of pretextual stops, the "would" test is consistent with the Court's analysis of Fourth Amendment "pretext" questions. In South Dakota v. Opperman, 428 U.S. 364 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Court analyzed whether the police had impounded an automobile that had outstanding parking tickets as a pretext to search it for drugs. The Court stated that "there is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive." Id. at 376, 96 S.Ct. at 3100 (footnote omitted). An inquiry into "standard procedure" is an inquiry into whether reasonable officers would have impounded a vehicle with outstanding parking tickets, absent an invalid purpose (to search it for drugs).
We conclude that the reasoning articulated by State v. Chapin, 75 Wash.App. 460, 879 P.2d 300, 304 (Wash. Ct. App. 1994), is persuasive in adopting the "would" test. Chapin noted:
We decline to follow a pure objective approach [the "could" test] for two reasons.

*797 First, if a court's inquiry is limited to determining whether the police had a lawful basis for making the stop which lead [sic] to the search and/or seizure, logically there can no longer be a pretext rule. This is because, under a pure objective approach, an officer's actions are per se reasonable if they are pursuant to lawful authority. The entire purpose of the pretext rule is to deter police from using their lawful authority to detain a person for a minor offense in order to investigate or search for evidence of a more serious offense... . We reject this approach because it extinguishes the rule.
Second, under a pure objective approach, there is no basis for judicial review of an officer's use of the discretionary power to stop so long as the stop has a lawful basis.
Id. (emphasis in original); see also United States v. Smith, 799 F.2d 704 (11th Cir.1986).
Because the district court concluded that it would follow the authority of the Seventh and Eighth Circuits, and not the Ninth Circuit, in making its decision, we conclude that the district court incorrectly applied the "could" test in determining whether or not to suppress the evidence obtained from Aurelio's truck.
In applying the "would" test, the stop of Aurelio's truck clearly violated the Fourth Amendment. The appropriate inquiry is whether Trooper Ames would have stopped Aurelio for crossing the fog line, absent the desire to search Aurelio's truck for drugs.[2] Trooper Ames would have acted reasonably only if he stopped every car that he observed crossing the fog line. See United States v. Strickland, 902 F.2d 937, 940 (11th Cir.1990).
If a trooper would have generally stopped a vehicle for going over the fog line, the trooper would have issued a citation or at the very least informed the driver as to why he was stopped. In the case at bar, Trooper Ames demonstrated that crossing the fog line is a very minor violation when he did not bother to inform Aurelio of the violation. Consequently, we conclude that in the case at bar, this was not the usual traffic violation that prompts reasonable officers to stop vehicles. See United States v. Miller, 821 F.2d 546 (11th Cir.1987) (holding that a reasonable officer would not have pulled over a vehicle that crossed over the white painted lane marker about four inches).
In addition, when the stop is suggested by someone who has no traffic related duties and there is no probable cause for that individual to stop the vehicle, then that indicates the stop was pretextual. See United States v. Millan, 36 F.3d 886, 889 (9th Cir.1994) (the fact that the stop was suggested by a city interdiction officer was an additional factor pointing toward pretext). In this case, Mr. Martinez suggested the stop and the facts which gave rise to his suspicions were insufficient articulable facts to justify the stop.
Where a search is conducted pursuant to a pretextual stop, any evidence obtained from the search must be suppressed under the exclusionary rule. This is true even if consent is obtained after the pretextual stop. See United States v. Thompson, 712 F.2d 1356, 1362 (11th Cir.1983); accord Brown v. State, 372 S.E.2d 514 (Ga. Ct. App. 1988) (even where consent after a pretextual stop was valid, the evidence obtained was suppressed).
Although it is unnecessary for the disposition of this appeal, we will briefly address the issue of whether Aurelio consented to the search.[3] "Voluntariness is a question of fact to be determined from the totality of the circumstances." Canada v. State, 104 Nev. 288, 290-91, 756 P.2d 552, 553 (1988) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 249-50, 93 S.Ct. 2041, 2058-60, 36 L.Ed.2d 854 (1973)). In the case at bar, there are several factors that alone may not *798 have invalidated consent. Taken together, however, these factors show a violation of Aurelio's constitutional right. The consent form that Aurelio signed was in English. Although Trooper Ames testified that he was aware that Aurelio did not speak English, he did not orally translate the consent form for Aurelio. Trooper Ames and two other officers presented the form to Aurelio and he simply signed the form without even asking what it was.
In United States v. Hidalgo, 7 F.3d 1566 (11th Cir.1993), appellant argued that the search of his residence and two automobiles was illegal because the consent form was in English and he spoke only Spanish. However, the Eleventh Circuit concluded otherwise because the form was explained to appellant before the police conducted the search. Id. at 1570. In the case at bar, the consent form was not explained to Aurelio before the police began the search.
In addition, United States v. Suarez, 694 F. Supp. 926 (S.D. Ga. 1988), stated, "It is inappropriate to rely on the terms of the English-language consent form where so little of that form was translated to Suarez [defendant]. Hodges [the officer] admitted that Spanish-language consent forms are available, and Hodges should have obtained one if he was intending to rely on it." Id. at 939 n. 10. We conclude that Trooper Ames should have done the same.
The State argues that Trooper Ames received additional consent from Aurelio. Trooper Ames, after having Aurelio sign the consent form, asked in Spanish, learned in a forty-hour course at the NHP academy, if he could search. Aurelio, apparently while in handcuffs, "nodded his head yes and gave me [Trooper Ames] hand motions towards the vehicle." Trooper Ames testified that the "conversation" between him and Aurelio was "garbled and confusing."
Consent under these circumstances is also not valid.
"The burden of proving consent rests with the state. Clear and persuasive evidence is required, particularly when the suspect is under arrest. [Citations omitted.] In such circumstances a court must distinguish between the peaceful submission by the arrested suspect to the authority of a law enforcement officer, from an intelligent and intentional waiver of a constitutional right."
Lightford v. State, 90 Nev. 136, 139, 520 P.2d 955, 956-57 (1974) (quoting Thurlow v. State, 81 Nev. 510, 515, 406 P.2d 918, 921 (1965)). The State, based on these facts, has not shown how Aurelio understood enough to consent. In addition, even if Aurelio gave consent to search the truck, the State has not shown how Aurelio consented to wait for Trooper Ames to call in a drug dog and, subsequently, unscrew the taillights of Aurelio's truck. See Canada, 104 Nev. at 291, 756 P.2d at 553 (a search conducted pursuant to consent must be limited to the terms of the consent). Therefore, the State has simply not met its burden. We cannot conclude that Aurelio intelligently and knowingly waived a constitutional right.[4]
Based on the foregoing, we reverse and vacate Aurelio's judgment of conviction.
SPRINGER, SHEARING and ROSE, JJ., concur.
STEFFEN, Chief Justice, concurring in result only:
I concur in the result of this case only because I am unconvinced that the arresting officer had a lawful basis for stopping Alejandre for twice crossing over the fog line by about "a tire width." Otherwise, I again register my strong opposition to the majority's adoption of the "would" test for Nevada as expressed in my special concurrence in *799 Taylor v. State ___ Nev. ___, 903 P.2d 805 (1995) issued on this same date.
I must also add my complete disagreement with the majority's evaluation of the reasoning in the case of State v. Chapin, 879 P.2d 300 (Wash. Ct. App. 1994), as "persuasive." In pertinent part, the Chapin court stated that "[t]he entire purpose of the pretext rule is to deter police from using their lawful authority to detain a person for a minor offense in order to investigate or search for evidence of a more serious offense.... We reject this approach because it extinguishes the rule." Id. at 304. With due respect to the Chapin court, I find their reasoning flawed and unpersuasive.
In effect, Chapin tells us that in this area of criminal investigation, we do not want the police to utilize their training and experience to ferret out serious crime even if they are able to do so constitutionally by effectuating a legal stop for some minor traffic offense. To do so, we are informed, would eliminate the pretext rule. I suggest that if this is what the pretext rule demands, the rule is unsound.
Moreover, if pretext is so offensive (it certainly is not unconstitutional), why do we permit undercover officers to attempt to deal with the drug menace by engaging in the pretext of buying or selling narcotics? Indeed, why is a lawful stop of a motorist for a traffic violation, however minor, more offensive as a pretext than the pretextual drug transaction?
I note that we are not contesting the reasonableness of an arresting officer's actions after making an arrest for a minor traffic offense. It seems to me that the major area of concern should be whether, pursuant to the pretext, an officer engages in a prolonged fishing expedition in order to confirm his suspicions.
NOTES
[1] In addition to the Ninth Circuit, three other circuits have adopted the "would" test: the Sixth Circuit, see United States v. Mans, 999 F.2d 966, 968 (6th Cir.1993); the Tenth Circuit, see United States v. Greenspan, 26 F.3d 1001, 1004-05 (10th Cir.1994); and the Eleventh Circuit, see United States v. Smith, 799 F.2d 704, 709 (11th Cir.1986).
[2] Crossing over the fog line is apparently a violation of NRS 484.305(1) which states, in relevant part, that "vehicles shall be driven as nearly as practicable entirely within a single lane... ." (Emphasis added.)
[3] Aurelio did not raise the issue of consent on appeal; however, this court may address issues of constitutional dimension sua sponte. Bradley v. Romeo, 102 Nev. 103, 105, 716 P.2d 227, 228 (1986).
[4] The record indicates that thirty to forty minutes after Aurelio was stopped, Trooper Ames asked Mr. Martinez, who spoke fluent Spanish, if he would again obtain consent from Aurelio. Mr. Martinez asked Aurelio if he consented to the search and Aurelio replied yes. However, this consent is also not valid. First, the search of the vehicle had already progressed. Second, this consent cannot be free from duress considering the facts that Aurelio was already in handcuffs and Mr. Martinez was conducting an immigration check on Aurelio. Finally, the fact that Trooper Ames asked Mr. Martinez to ask Aurelio again if he consented strengthens our conclusion that even Trooper Ames did not believe the consent he originally received was valid.